UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————————

STANLEY MARTIN, FREE THE
PEOPLE ROC, and NATIONAL
LAWYERS GUILD ROCHESTER,
INC.,

                                    Plaintiffs,

                                                                    DECISION and ORDER

-vs-
                                                                    20-CV-6538 CJS

LOVELY ANN WARREN, in Her Official
Capacity, THE CITY OF ROCHESTER,
a Municipal Entity,

                                    Defendants.

———————————————————————————

INTRODUCTION

       This action challenges the constitutionality of an Emergency Order, restricting

gatherings, of more than four persons outdoors and more than nine persons indoors, in

the City of Rochester between the hours of 11:00 p.m. and 5:00 a.m., that was issued by

the Mayor of Rochester, Lovely Warren, purportedly to combat two evils: A failure by

citizens during the overnight hours to observe practices required to prevent the spread of

Covid-19; and, a simultaneous increase in gun violence during the overnight hours at

large social gatherings in the City.   Now before the Court is Plaintiffs' application (ECF

No. 3) for preliminary injunctive relief, which maintains that the Emergency Order is

unconstitutional on its face and as applied, in violation of the First and Fourteenth

Amendments to the Constitution.   The application is denied.

BACKGROUND

This action arises against the backdrop of three well-documented circumstances: The Covid-19 pandemic and the attempts by various governmental agencies to stop, or at least slow, the spread of the illness; civil unrest and anti-police protests that began following the death of George Floyd on May 25, 2020, during an arrest in Minneapolis; and a recent surge in murders and gun violence in American cities.[1]

With regard to the first of these, it is well known that in response to the Covid-19 outbreak the State of New York took a number of unprecedented and controversial measures. Of particular relevance to this action, Defendants note that, "[o]n March 7, 2020, Governor Cuomo issued Executive Order 202, which declared a disaster emergency in New York. Thereafter, as the crisis unfolded, Governor Cuomo issued an additional 55 Executive Orders related to the disaster emergency, numbered 202.1 through 202.55." Defendants further note that, among other things, those Executive Orders "implemented strict social distancing and face covering requirements" which resulted in "New York's positive case rate . . . declin[ing] dramatically." Defendants state that eventually, "in mid-May, the State of New York and the Rochester region began to reopen," "with [caveats] from local governmental leaders and public health officials that

_____

[1] *See, e.g.*, New York Times July 13, 2020, "*It's Been 'Such a Weird Year.' That's Also Reflected in Crime Statistics.*"  ("Overall crime is down 5.3 percent in 25 large American cities relative to the same period in 2019, with violent crime down 2 percent. But murder in these 25 cities is up 16.1 percent in relation to last year. It's not just a handful of cities driving this change, either. Property crime is down in 18 of the 25 sampled cities, and violent crime is down in 11 of them, but murder is up in 20 of the cities. Homicides usually rise in the summer, which coincided this year with many people emerging from pandemic lockdown. In one recent weekend in Chicago, 14 people were killed and at least 106 people were shot, the most in eight years. And as The New York Times reported recently: "It has been nearly a quarter century since New York City experienced as much gun violence in the month of June as it has seen this year." (On Sunday, there were at least nine killings in the city.) An additional 11 cities provide year-to-date murder data. Murder is up 21.8 percent in all 36 cities with 2020  data through at least May, with 29 of those cities seeing an increase this year relative to last year.").

failure to continue to abide by social distancing and mask-wearing requirements could result in increased transmission of the virus."

Defendants contend that despite these warnings, and despite additional warnings from the Monroe County Health Department, people in the City of Rochester "continued to gather in large numbers, [both indoors and outdoors], and without proper social distancing,[2] driving up positive case numbers, particularly amongst younger people." Defendants maintain that these large social gatherings occurred mainly late at night.

Defendants maintain that these large, late-night social gatherings, in addition to being occasions for the spread of Covid-19, were also occasions of gun violence resulting in higher-than-normal numbers of shooting victims.   Defendants state that, "[o]ver the period of June 1 through July 15, the number of shooting incidents is up 49% this year, from 37 shootings in 2019 to 55 this year," and that,

> [e]ven more alarming than the raw numbers of shootings that have taken place in the City of Rochester, is the outsized number of victims of shootings. The 37 shootings that took place in the City in 2019 resulted in 40 gunshot victims. This year's 55 shootings in June and early July have resulted in 70 victims—an increase of 75% over the same period in 2019.
> ***
> The disproportionate increase in the number of victims is attributable, at least in
> part, to the large late-night gatherings taking place in public places in the City and at house parties, resulting in additional individuals being exposed to gun fire.

Beath Decl., ECF No. 7 at ¶ ¶ 40–41.

---

[2] Defendants state that, "Executive Order 202.42, issued on June 15, 2020, allowed non-essential social gatherings of up to 25 people so long as social distancing, face-covering, and appropriate sanitation and disinfection were observed," and that "On June 26, 2020, the Finger Lakes Region entered Phase 4 of the reopening, which allowed for gatherings of up to 50 people so long as social distancing, face-covering, and appropriate sanitation and disinfection were observed."

Defendants state that two of the worst of these late-night shooting incidents occurred just prior to the enactment of the challenged Emergency Order, on July 5, 2020, and July 11, 2020, when "multiple gunshot victims" were injured.  Specifically, Rochester Police Department ("RPD") Commander Fabian Rivera ("Rivera") states that on July 5th, at 12:37 a.m., a large group of people had gathered in a parking lot in the area of Chili Avenue and Post Avenue when "multiple individuals began to fire guns at each other, resulting in three individuals being wounded and two others having bullet damage to their apartments," and that, on July 11th, at 1:36 a.m., at a large gathering covering two parking lots on North Clinton Avenue, multiple gunshots were fired resulting in six individuals being wounded.[3]

At or around this same time, groups and individuals, including Plaintiffs, were carrying out protests in the City of Rochester. *See, e.g.,* Compl., ECF No. 1 at ¶ 2 ("Plaintiffs have been engaged intensively with peaceful protests in Rochester for the past eight weeks, and they and their members have additional peaceful protests planned for the immediate future.").  Among other things, these protests have "oppos[ed] police violence" and called for the City to defund the RPD.[4]  The Complaint asserts that, "[s]ince the end of May 2020, there have been weekly protests and actions throughout the City of Rochester, ranging in size from a few dozen people to thousands. These protests have occurred throughout Rochester and are often centered in Martin Luther King Jr. Memorial Park [("the Park")]."[5]  Defendants maintain that prior to July 15, 2020, all of these protests had occurred during daytime hours,[6] though Plaintiffs contend that one such protest

---

[3] Rivera Affirmation, ECF No. 7-5 at ¶ ¶ 28–29.
[4] Compl., ECF No. 1  at ¶ 12.
[5] Compl., ECF No. 1  at ¶ 39.
[6] Beath Decl., ECF No. 7 at ¶ 49.

occurred at night, on June 19, 2020.

On July 15, 2020, Mayor Warren "issued [the subject] Local Emergency Order pursuant to [New York] Executive Law § 24, which made it unlawful, between the hours of 11:00 p.m. and 5:00 a.m., to gather in groups of five or more in a public place or in groups of ten or more inside a location not otherwise subject to the oversight of the State Liquor Authority."[7]  Specifically, the Emergency Order stated, in pertinent part:

> ORDERED that, between the hours of 11:00 p.m. and 5:00 a.m., it shall be unlawful to gather in groups of five or more in a public place in the City of Rochester. For purposes of this clause, a public place includes any outdoor premises or other area that is open to the public, including but not limited to streets, sidewalks, parks, parking lots, vacant lots and any unused or unimproved land. Violation of this clause shall be a class B misdemeanor in accordance with Executive Law §24(5); and it is further
>
> ORDERED that, between the hours of 11:00 p.m. and 5:00 a.m., it shall be unlawful for groups of ten or more unrelated individuals to gather inside of any location or premises unless such a gathering is within premises licensed under the Alcoholic Beverage Control Law [("the ABC Law")] and operated in compliance with the regulations and rules promulgated by the State Liquor Authority;

(ECF No. 3-2).

The Mayor's purported justifications for the Emergency Order were to prevent the further spread of Covid-19 and to quell the surge in violence in the City of Rochester. *See*, Compl., ECF No. 1  at ¶ ¶  20–21; *see also, id.* at ¶ 32 ("Mayor Warren purports to have implemented and renewed the Emergency Order to protect public safety.").

---

[7] Beath Decl., ECF No. 7 at ¶ 43.

In response to the Mayor's action, on the late evening of July 15, 2020, and early morning hours of July 16, 2020, individuals gathered in the Park, specifically to protest the Emergency Order.  *See*, Compl., ECF No. 1 at ¶ ¶ 43–44 ("In response to Mayor Warren's Emergency Order, Ms. Martin and FTP ROC organized a protest for the night of July 15–16, 2020.  The protest began around 11:00 p.m. in Martin Luther King Jr. Memorial Park.  Several organizers made speeches explaining why Mayor Warren's Emergency Order violated the First Amendment and would be enforced in a discriminatory manner.").

At approximately 1:30 a.m. on July 16th, after the protest had been proceeding for approximately 2.5 two hours,[8] RPD officers informed the protesters several times that they were violating the Emergency Order and had to disperse or else be arrested.  At approximately 1:40 a.m., after repeatedly issuing such warnings,[9] the RPD officers began arresting protesters.  At approximately 2:16 a.m., officers issued additional warnings to the remaining protesters that they would be arrested if they did not disperse.  Ultimately, officers arrested thirty (30) protesters who had remained gathered in the Park, twenty-seven (27) of whom were Caucasian according to Defendants.  Those arrested were transferred to the Public Safety Building in vans, processed, and released with appearance tickets.

The initial Emergency Order indicated that it would remain in effect for five days. Subsequently, the Mayor has reissued the order each time it has expired, and it currently remains in effect.[10]

---

[8] Compl. at ¶ ¶ 44–50.
[9] Compl. at ¶ 44–52.
[10] Beath Decl., ECF No. 7 at ¶ 44 (Defendants state that, "a Local Emergency Order issued under Executive Law § 24 remains in effect for only five days," and that, subsequently, "the Mayor has reissued

On July 24, 2020, Plaintiffs filed the subject action under 42 U.S.C. § 1983, alleging that the Mayor's issuance of the Emergency Order violates their federal constitutional rights.  More specifically, the Complaint purports to allege five separate causes of action: 1) a claim that the Emergency Order violates Plaintiffs' First Amendment rights of "Freedom of Speech, Peaceful Assembly, the Press, and the Right to Petition the Government for Redress of Grievances";  2) a claim that the Emergency Order violates Plaintiffs' First Amendment and Fourteenth Amendment right to "freedom of movement"; 3) a claim that the Emergency Order violates Plaintiffs' Fourteenth Amendment Equal Protection rights; 4) a claim that the Emergency Order is "void for vagueness" and therefore violates Plaintiffs' First and Fourteenth Amendment rights; and 5) a claim for a declaratory judgment and injunctive relief.

The Complaint maintains that there is no significant governmental interest behind the Emergency Order.  Rather, the Complaint essentially asserts that the Emergency Order is an unnecessary and disingenuous enactment.  The Complaint contends, for example, that  "[t]here is no public health justification for Mayor Warren's Emergency Order,"[11] and that it makes no sense to ban nighttime outdoor gatherings of more than four persons, while allowing up to nine persons to gather indoors generally, and while allowing more persons than that to gather in bars and taverns, since Covid-19 is less likely to be transmitted outdoors than indoors, and since it has been shown that bars and taverns are places where Covid-19 is easily spread.  The Complaint further contends that

---

[the] order on July 20, July 25, July 30 and August 4, 2020.").  At oral argument, Defendants' counsel indicated that the Mayor has continued to reissue the Emergency Order each time it has expired.  The Court is aware that there have actually been multiple identical  Emergency Orders, but for convenience, the Court will refer to "the Emergency Order" in the singular.

[11] Compl., ECF No. 1  at ¶ 22

the Mayor's true purpose in issuing the Emergency Order could not have been to stop the spread of Covid-19, since the RPD officers who arrested protesters on July 16th failed to observe protocols to prevent the transmission of the disease, resulting in one protester contracting Covid-19.[12]

Indeed, the Complaint insinuates that there was a more nefarious reason for the adoption of the Emergency Order, related to alleged ongoing incidents of police misconduct by RPD officers during the overnight hours.   In particular, the Complaint states that the issuance of the Order followed "high-profile police misconduct incidents that occurred between 11:00 p.m. and 5:00 a.m. in the City of Rochester."[13]  On this point, the Complaint states:

> 29.  Mayor Warren issued the Emergency Order shortly after several high-profile
> police misconduct incidents that occurred between 11:00 p.m. and 5:00 a.m. in the City of Rochester.
>
> 30. On June 28, 2020, RPD Officers Vandemar, Badge No. 2846, Lindauer, Badge No. 2363, and Contreras, Badge No. 2512, trespassed inside of the home of a young man named Tobias Massey, where they assaulted, battered and falsely arrested him in response to him lawfully recording the officers forcibly arrest and sit on the neck of a man in the front yard of his home. They arrested Mr. Massey and charged him with Obstruction of Governmental Administration and Resisting Arrest. RPD Chief La'Ron Singletary admitted that based on the

---

[12] Compl., ECF No. 1 at ¶ ¶ 56–57; *see also*, Pls.' Mem. of Law, ECF No. 3-10 at p. 14 ("When the protesters were arrested and removed from the kettle, one by one, they were escorted by RPD officers to three vans, where RPD officers removed their mask to take their picture with their arresting officer. Many officers refused to put [the protesters'] masks back on, and when they did, they touched the protesters' faces without having washed or sanitized their hands.  The protesters were then packed into transport vans. The RPD refused to place the masks back on the faces of several protesters, and none of the police officers wore masks in the vans, so multiple people in each van were not wearing face coverings. Eventually the vans drove to the police station at 630 North Clinton Avenue, but before they departed for the station, protesters were forced to sit in the van for approximately 30 minutes.  The 30 protesters remained packed inside of three crowded, unventilated vans with unmasked individuals for over an hour. At least one arrestee has since contracted COVID-19.").
[13] Compl., ECF No. 1 at ¶ 29.

officers Body Worn Camera recordings and cell phone recordings of the incident, the officers lacked any reason to arrest Mr. Massey, charge him with any crime, or use any force against him.

31. On July 5, 2020, at approximately 2:00 a.m., RPD officers responded to a house on Pennsylvania Avenue in response in response to a 911 call that a 16-year-old boy was shot in the face and needed medical assistance. When RPD officers arrived at the boy's house, they immediately assaulted and handcuffed two people who were comforting the boy and tending to his wounds. Coincidentally, Plaintiff Ms. Martin and several of her friends who are also prominent in the activist community were sitting in the back yard of a neighboring home when the police arrived. When Ms. Martin and her friends heard the boy yell out, "we called you for help and now you're abusing us," they responded to the scene. When the group of activists began recording the incident and demanding the release of the two individuals who were handcuffed, the RPD retaliated against them by arresting four of Ms. Martin's friends and charging them with Obstruction of Governmental Administration.[14]

From this, the Complaint evidently means to suggest that the Mayor's true intention in issuing Emergency Order was to keep people off the streets at night, either so that the RPD would not have any further "high-profile police misconduct incidents," or so that there would be fewer witnesses to such incidents.[15]

Alternatively, but along those same lines, the Complaint seems to suggest that the Mayor's issuance of the Emergency Order was actually intended to stop protests against her administration and the RPD. On this point, Plaintiffs indicate that in the months leading up to the issuance of the Emergency Order, they participated in protests against the police and demanded that the Mayor "defund"

---

[14] Compl., ECF No. 1 at ¶ ¶ 29–31.
[15] This is how the Court understood Plaintiffs' Complaint and their application for injunctive relief. At oral argument, Plaintiffs' counsel referenced these incidents in support of a different point, which is that protesters should be free to protest at night since, for example, incidents of alleged police misconduct such as those just mentioned occur at night.

the RPD and apply those funds to Black communities.[16]

The Complaint further alleges that the Emergency Order was unnecessary, since there are already laws on the books which the police could utilize to disperse groups of people gathered improperly in public places:

32. Mayor Warren purports to have implemented and renewed the Emergency Order to protect public safety.

33. Yet, the City and its Police Department already have a variety of ordinances and state statutes available to protect the public's safety and curb violent crime, to the extent those interests are threatened by the gathering of five or more individuals outdoors, or ten or more individuals indoors, between the hours of 11:00 p.m. and 5:00 a.m.

34. Among those existing provisions, N.Y. Penal Law § 240.2(6) already forbids,
"congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse" when such congregation and refusal to disperse is done "with the intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof."

35. Mayor Warren nevertheless issued and renewed the new Emergency Order.

Compl., ECF No. 1 at ¶ ¶ 32–35.

On August 4, 2020, Plaintiffs filed the subject application (ECF No. 3) for a temporary restraining order and a preliminary injunction, directed at what they refer to as the "curfew portion" of the Emergency Order, quoted above.  Plaintiffs maintain that they are entitled to preliminary injunctive relief because they are likely to succeed on the merits

---

[16] Compl., ECF No. 1  at ¶ ¶ 38–41; *see also, id.* at ¶ 41 ("Plaintiffs Ms. Martin and FTP ROC have called on Mayor Warren to defund the Rochester Police Department, and redirect resources to Black communities to reduce poverty and provide greater educational and job opportunities, which research has shown is more effective in reducing violent crime than an increased police presence.").

of their First Amendment claims,[17] they will suffer irreparable harm if relief is not granted, the balance of equities weighs in their favor, and a preliminary injunction is in the public interest.  The evidence and offers of proof submitted in support of the application relate almost exclusively to the events that took place at the demonstration on July 16, 2020.[18]

With regard to their purported likelihood of success on the merits, Plaintiffs maintain, preliminarily, that they are entitled to "heightened First Amendment protection" because the challenged provisions have the effect of preventing them from protesting in public parks and on public streets and sidewalks, which are "traditional public forums that are entitled to heightened First Amendment protection."[19]

Next, Plaintiffs contend that they are likely to succeed on the merits of their First Amendment claims.  In this regard, Plaintiffs contend that the Emergency Order is a "time, place or manner" restriction on protected First Amendment speech, and that the proper test is therefore found in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S. Ct. 2746 (1989) ("*Ward*"),[20] in which the Supreme Court "clarif[ied] the legal standard applicable to governmental regulation of the time, place, or manner of protected speech." *Id.*, 491 U.S. at 789.  The regulation at issue in *Ward* purported to regulate the performance of music, which the Supreme Court noted was a form of First Amendment expression. *See, id.* at p. 790 ("Music, as a form of expression and communication, is protected under the First

---

[17] As already mentioned, the Complaint also purports to state an Equal Protection claim.  Plaintiffs have not alleged in this application that they are likely to succeed on such claim.  Noting this, Defendants argue that even if Plaintiffs were seeking injunctive relief on that claim, it would fails since that claim is based only on "rank speculation." *See*, ECF No. 7-8 at p. 6, n. 1 ("In their complaint, plaintiffs assert, as the third claim for relief, a violation of the Equal Protection Clause. That claim, supported only by rank speculation, lacks any factual underpinning in the complaint and plaintiffs do not argue on this motion that the preliminary injunction should be granted on equal protection grounds.").  The Court agrees that the Equal Protection claim seems to lack any factual support.
[18] *See*, e.g., ECF No. 3-3.
[19] ECF No. 3-10 at p. 8.
[20] ECF No. 3-10 at p. 19.

11

Amendment.").  In pertinent part, the Supreme Court held that,

> even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Id.* at 791 (citations and internal quotation marks omitted).  The Supreme Court stated that,

> [t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech.

*Id.* at 791 (citations and internal quotation marks omitted). The Supreme Court further clarified the "narrowly tailored" requirement, stating that,

> a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.  Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.  To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.  So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.  The validity of time, place, or manner regulations

does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.

*Id.* at 798–800 (citations, internal quotation marks and footnotes omitted).

Plaintiffs here contend that they are likely to succeed on the merits of their First Amendment claims under the *Ward* test, because the Emergency Order, which they admit is content neutral,[21] is not narrowly tailored to serve a significant governmental interest. In particular, Plaintiffs contend that the Emergency Order is not "narrowly tailored" since it effectively bans all First Amendment expressions by groups of more than four people outdoors, and by groups of more than nine people indoors, between the hours of 11 p.m. and 5 a.m., and does not provide any exceptions for First Amendment activities.[22]   In this regard, Plaintiffs contend that the Emergency Order is overbroad since it is more restrictive than necessary to achieve the Mayor's stated purposes and will prohibit outdoor group First Amendment expressions such as protests, and indoor group First Amendment expressions such as religious services and gatherings to discuss political

---

[21] ECF No. 3-10 at p. 19 ("On its face, the Curfew is content-neutral, but it is not narrowly tailored to serve the significant government interest in the reduction of violent crime or transmission of COVID-19, and it does not leave open adequate alternative channels of communication.").

[22] *See*, ECF No. 3-10 at p. 21 (Arguing that the Emergency Order "proscribes almost every from of public expression during the late-night hours" and "does not contain an exception for First Amendment protected activities."). Plaintiffs maintain that Defendants have the burden "to demonstrate that the interest served justifies the restriction imposed," and that they cannot do so, since the Emergency Order "proscribes almost every form of public expression during the late-night hours," without providing any exception for First Amendment activities.   Plaintiffs' argument on this point boils down to the assertion that the Emergency Order cannot be "narrowly tailored" unless it provides an exception for First Amendment activities.   As support for this argument, Plaintiffs primarily cite a decision of the New York Court of Appeals, *Anonymous v. City of Rochester*, 13 N.Y.3d 35 (2009) ("Anonymous"). *See*, Pls.' Mem. of Law, ECF No. 3-10, at p. 21 ("Because the Curfew here contains no such exception, it reaches substantially more protected conduct than the curfew at issue in *Anonymous*. As such, it is fails the "narrowly tailored" prong of the *Ward* test. For this reason alone, the Court should grant Plaintiffs' instant motion for a Temporary Restraining Order and preliminary injunctive relief.") (emphasis added).   Plaintiffs also rely heavily on a decision by the Seventh Circuit Court of Appeals, *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1053 (7th Cir. 2004).

13

events.[23]

Further, Plaintiffs contend that they are likely to succeed under the *Ward* test since the Emergency Order fails to "leave open adequate alternative channels of communication."[24]   In this regard, Plaintiffs contend that even though the Emergency Order only applies from 11:00 p.m. to 5:00 a.m., leaving them eighteen hours per day in which to hold protests during the morning, afternoon and evening, this does not necessarily mean that they have adequate alternative opportunities to hold protests, since some group First Amendment expressions need to take place at night to have their intended effect.[25] Plaintiffs contend, for example, that certain types of protected First Amendment activities, such as outdoor protests, religious services and political gatherings, need to occur specifically at night.   Plaintiffs therefore maintain that they prevail under the *Ward* test for "time, place or manner" restrictions.

Plaintiffs also contend that the Emergency Order is impermissibly vague.[26] Specifically, Plaintiffs argue that it is not clear what constitutes a "group" under the Emergency Order, stating: "Here, the Curfew is unconstitutionally vague because it provides no guidance on what constitutes "a group[] of five or more" people in a public place, or a "group[] of ten or more unrelated individuals … inside of any location or

---

[23] ECF No. 3-10 at pp. 23–24.

[24] ECF No. 3-10 at p. 21.

[25] *See*, ECF No. 3-10 at pp. 22–23 ("Because the Curfew strips everyone in the City of Rochester of their right to participate in late-night activities *whose context and message are tied to the late hour* and the public forum, it does not provide for adequate alternative methods for expression.") (emphasis added); see also, id. at p. 15 ("Free the People ROC has future nighttime demonstrations planned to commemorate various police brutality incidents in Rochester that occurred at night. They plan to hold these events at the location where the incident happened, at the same time of night when the incident occurred.").

[26] *See*, ECF No. 3-10 at p. 25 ("Here, the Curfew is unconstitutionally vague because it provides no guidance on what constitutes "a group[] of five or more" people in a public place, or a "group[] of ten or more unrelated individuals . . .  inside of any location or premises.").

premises".[27]

Plaintiffs next contend that they will suffer irreparable harm if their application is not granted, since "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[28]

Plaintiffs further contend that an injunction would be in the public interest, since "the constitutional rights of protesters, legal observers and journalists" are important to the public.[29]   And, finally, Plaintiffs maintain that they have "raised serious First Amendment questions," and that the balance of hardships therefore "tips sharply in [their] favor."[30]

On August 6, 2020, Defendants filed their opposition (ECF No. 7) to the subject application.  Regarding the applicable standard for obtaining preliminary injunctive relief, which was referenced above and will be discussed further below, Defendants concede that Plaintiffs have satisfied the "irreparable harm" requirement, but contend that Plaintiffs cannot make the remaining required showings, namely, that they are likely to succeed on the merits of their First Amendment claims; that the balance of equities tips in their favor; and that an injunction would be in the public interest.

Preliminarily, Defendants maintain that it is incorrect for Plaintiffs to rely on the *Ward* test, since *Ward*'s "reasonable time, place and manner" test is to be applied where

---

[27] *See,* ECF No. 3-10 at p. 25; *see also,* ECF No. 3-10 at p. 13 ("[A] protester named Tarik Grandoit repeatedly asked the officers how far away from the other protesters he had to stand to not be considered part of the 'group.' He walked approximately 15 to twenty feet away from the rest of the protesters and asked, 'am I a group of one?' He then stood directly next to a journalist named Darien Lamen and asked the officers, 'are we a group of two now?' He repeated this several more times, standing next to others and asking, 'are we a group of two?', and by himself and asking, 'am I a group of one?' The officers never answered him.").
[28] ECF No. 3-10 at p. 29 (citation omitted).
[29] ECF No. 3-10 at pp. 30–31. Plaintiffs contend that "legal observers" and journalists were among those arrested on July 16th for violating the Emergency Order.
[30] ECF No. 3-10 at p. 31.

the regulation at issue directly limits oral or written expression," and the Emergency Order "include[s] no such direct limitation."[31]  Rather, Defendants contend that the proper test is contained in *United States v. O'Brien*, 391 U.S. 367, 376,  88 S. Ct. 1673, 1678–79 (1968) ("*O'Brien*"),[32] in which the Supreme Court considered the constitutionality of a criminal statute prohibiting the destruction of draft cards.  The statute on its face did not restrict free speech or expression, but the defendant, who had burned his draft card in protest, claimed that the statute nevertheless restricted his First Amendment right of expression.  The Supreme Court stated the appropriate test as follows:

> This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien*, 391 U.S. at 376–77 (footnotes omitted).

Defendants maintain that the Emergency Order passes the *O'Brien* test, since the Mayor was authorized to issue the order (N.Y. Executive Law § 24),[33] the order furthers an important governmental interest unrelated to the suppression of free speech

---

[31] ECF No. 7-8 at p. 18.

[32] ECF No. 7-8 at p. 15.

[33] Defendants contend that in addition to being authorized to enact the Emergency Order by Executive Law § 24, the Mayor has broad authority to act in the face of a threat to public health and safety pursuant to *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27 (1905).

(preventing the spread of Covid-19 and preventing mass casualties from late-night shootings), and the order's incidental restriction on late-night gatherings (of more than four people outdoors and more than nine people indoors) is no greater than is essential to further the government's interest.  Defendants indicate that the only *O'Brien* factor Plaintiffs seriously dispute is the last one, but that the Emergency Order satisfies that requirement, since

> [t]he Supreme Court has explained that "an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 67 (2006).

ECF No. 7-8 at p. 17.

Defendants state that in any event, the *O'Brien* test is essentially the same as the *Ward* test, and that insofar as the Emergency Order is a "regulation of the time, place, or manner of protected speech" as Plaintiffs maintain, it is constitutional because it is content-neutral, "narrowly tailored" -- which requires only that it "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation" -- and leaves "open ample alternative channels for communication."[34]   Further as to these points, Defendants state:

> [T]he limitation on gatherings is for only six hours during the latest period of night when most people are not out on the streets. During the daylight hours, when most communicative conduct takes place, people may gather together as they see fit, subject to the limitations of the Governor's executive orders. The Emergency Orders also do not impose a curfew—people are

---

[34] ECF No. 7-8 at pp. 19–20; *see also, id* at p. 6 (Arguing that "the application should be denied, as the Order is a content-neutral, properly tailored regulation of conduct with only an incidental impact on speech that serves substantial and important government interests. The order was properly issued pursuant to the Mayor's emergency powers under State law, and is not unconstitutionally vague.").

> free to come and go, to do and say what they wish, at all hours, so long as they do so in groups of less than five when out in a public place, and less than ten when indoors.
>
> ***
>
> The subject provisions of the Emergency Order have not even incidental impact on First Amendment rights during 18 hours of the day—including all daylight hours. And people remain free to engage in their First Amendment rights overnight as well—they just cannot gather in groups of more than four outdoors and nine indoors while doing so.

ECF No. 7-8 at pp. 20–21.

In response to Plaintiffs' suggestions to the contrary, Defendants reiterate that the twin purposes of the Emergency Order were to prevent the spread of Covid-19 that was occurring due to a failure by city residents to wear masks and observe social distancing rules during late-night social gatherings, and to stop the gun violence that was occurring at these same gatherings.  Defendants further maintain that the Emergency Order has been effective in achieving its purposes, stating:

> Aside from these arrests made in the early morning of July 16, police have had to make no other arrests for violation of the Mayor's Emergency Order. Rivera Affidavit ¶ 54. And the Emergency Order has otherwise proved effective in both enforcing social distancing and reducing the victims of gun violence by avoiding large gatherings. Rivera Affidavit ¶¶ 32–36. Before the Emergency Order went into effect, during the first two weeks of July (June 30 to July 13), there were 18 shooting incidents resulting in 31 victims who suffered gunshot wounds. After the Emergency Order went into effect, during the second two weeks in July (July 14 to July 27), there were 20 shooting incidents resulting in 20 victims who suffered gunshot wounds. Thus, although the number of shooting incidents increased slightly in the latter half of the month, the number of gunshot victims fell by over a third. Rivera Affidavit ¶ 37.

ECF No. 7-8 at p. 13.

Defendants deny that there was any intention to violate First Amendment rights, and state, to the contrary, that when adopting the Emergency Order, the Mayor specifically considered the fact that because the Order only applied during the nighttime hours, it would not interfere with the anti-police protests, which had been taking place during the daytime hours. *See*, Beath Decl., ECF No. 7 at ¶ 49 ("[T]he City administration did not want the Emergency Order to unduly burden the peaceful demonstrations against police brutality and racial injustice that had been a regular occurrence in the City since late May, all of which had, at least through July 15, taken place during the day."); *see also, id.* at ¶ 49 ("[U]ntil July 15, 2020, none of the demonstrations for racial justice and against police brutality that had taken place in the City of Rochester since May of 2020 occurred at night—all occurred during the daylight hours, maximizing the visibility of the protest."). (As already mentioned, Plaintiffs maintain that one nighttime protest took place on June 19, 2020, prior to the issuance of the Emergency Order, but apparently concede that the remaining protests took place during the daytime).

Defendants also maintain that in considering the constitutionality of the Emergency Order, the Court must take into account that these are "extraordinary times" due to the Covid-19 pandemic, and must give referring to the Covid-19 additional leeway to the Mayor.[35]

In response to Plaintiffs' criticism of the Mayor's decision to exclude bars and taverns from the nighttime indoor occupancy restriction in the Emergency Order, Defendants explain that there was a good reason for the exclusion, stating:

> Because of the robust regulatory framework applied to establishments subject to supervision by the State Liquor Authority under the Alcoholic

---

[35] ECF No. 7-8 at p. 21.

> Beverage Control Law, and the fact that the Governor's Orders expressly include the ability to enforce occupancy limitations against such businesses, the City opted to carve those establishments out of the Executive Order's limitations. *See, e.g., People v. De Jesus*, 54 N.Y.2d 465, 469 (1981)(noting that the Alcoholic Beverage Control Law's "regulatory system" is "both comprehensive and detailed.").

ECF No. 7 at p. 13, n. 2.  From this, the Court understands Defendants to be alluding to the fact that New York municipalities are preempted from legislating within the field covered by the ABC Law[36]. *See, e.g., People v. De Jesus*, 54 N.Y.2d 465, 470, 430 N.E.2d 1260, 1262–63 (1981) ("It should come then as no surprise that the courts, the New York State Moreland Commission on the Alcoholic Beverage Control Law, New York State's Attorney-General and its Comptroller all have recognized that the Alcoholic Beverage Control Law is exclusive and State-wide in scope and that, thus, no local government may legislate in this field.") (citations and footnotes omitted).

Defendants contend that Plaintiffs' "void-for-vagueness" argument lacks merit, since, "an ordinary person exercising ordinary common sense can sufficiently understand and comply with" the Mayor's Emergency Orders," notwithstanding the claimed confusion on this point by one of the protesters who was arrested on July 16th.[37]

Defendants further contend that the balance of the equities do not tip in Plaintiffs' favor, since the burden imposed on them by the Emergency Order is small, as discussed above, and since prior to the issuance of the Emergency Order, Plaintiffs protested primarily during the daytime.  Finally, Defendants assert that the issuance of an injunction would not be in the public interest, stating:

---

[36] Alcoholic Beverage Control Law
[37] ECF No. 7-8 at p. 24.  The protester indicated to RPD officers that he did not understand the Emergency Order's use of the word "group."

> The Emergency Orders are aimed at curbing the incidents of shootings and gunshot victims and reducing the spread of COVID-19 in the City of Rochester. This interest far outweighs any rival interest that people may have in midnight protests in the midst of an otherwise empty City.

ECF No. 7-8 at p. 25.

On August 9, 2020, Plaintiffs filed a reply (ECF No. 8) which largely reiterates the arguments in their moving brief, [38] such as that the Mayor did not actually issue the Emergency Order to address Covid-19.  Indeed, Plaintiffs assert that "there is no rational relation between the Mayor's curfew and reduction in interhuman transmission of COVID-19 [or the reduction of gun violence]," and that, "[i]nstead, COVID-19 was an obvious pretext to enact the unlawful Curfew."[39]  Plaintiffs argue, for example, that "Defendants [have] failed to show that more shootings occur between the hours of 11:00 p.m. and 5:00 a.m. than other hours of the day."[40]  Plaintiffs further contend that the Emergency Order has not been effective, stating:

> Defendants admit that the number of shootings actually rose in the two weeks after the Curfew was implemented. But they claim that the Curfew caused a reduction in the overall number of shooting victims, apparently because of a reduction in large gatherings. But Defendants offer no proof to support the claim that the Curfew caused a drop in shooting victims. Instead, the 31 shooting victims in the first two weeks of July was so high that it was inevitable that the number of victims would drop.[41] Moreover, viewed historically, the 20 shooting incidents and 20 victims in the last two weeks of July is still abnormally high for Rochester, which suggests that the

---

[38] To the extent that the reply raises new arguments that are not either contained in Plaintiffs' initial moving papers or directly responsive to a point contained in Defendants' responding papers, the Court declines to consider them.

[39] ECF No. 8 at p. 8.  As a new argument, Plaintiffs contend that rather than issuing the Emergency Order, the Mayor could have asked the Governor to rescind the executive order permitting up to 50 persons to gather provided that they observed social distancing.

[40] ECF No. 8 at p. 8.

[41] Plaintiffs reiterated this point during oral argument.  Essentially, Plaintiffs are arguing that the number of shooting victims immediately prior to the issuance of the Emergency Order was so high that the City should have figured that it was just a statistical anomaly and done nothing, based on the assumption that the number of shootings would eventually drop back to their historic levels.

Curfew has not had any effect on reducing gun violence.

ECF No. 8 at p. 9.

Plaintiffs also reiterate that the Emergency Order is not narrowly tailored, since it does not include an exception for First Amendment expressions,[42] and that it "is unconstitutionally vague because it does not define the term 'group'."[43]  On this last point, Plaintiffs posit that an ordinary person might not think that a gathering of people was a "group" as long as each person maintained "social-distancing."

Plaintiffs further indicate that to the extent that Defendants have cited cases to the Court involving similar restrictions in New York City or elsewhere that have been upheld by federal courts, the Court should disregard those cases since the situation in Rochester now is completely unlike the situation in New York at the time those cases were decided.[44]

Along with their request for preliminary injunctive relief, Plaintiffs requested (ECF No. 4) an expedited hearing.  On August 6, 2020, the Court granted that application by scheduling a  hearing on August 12, 2020.

On August 12, 2020, counsel for the parties appeared before the undersigned for oral argument via videoconferencing.  The Court has considered the parties' submissions and the arguments of counsel.

---

[42] Reply, ECF No. 8 at p. 12 ("As [it contains no exception for First Amendment expression,] "the Curfew fails both the "furthers an important or substantial governmental interest" prong of the O'Brien test and the "narrowly tailored" prong of the Ward test. For this reason alone, the Court should grant Plaintiffs' instant motion for a temporary restraining order and preliminary injunction.").

[43] ECF No. 8 at p. 12.

[44] See, Reply, ECF No. 8 at p. 7 ("There is simply no comparison between Rochester's Curfew, announced on July 15, 2020 when Rochester was in Phase IV of the reopening plan, and NYC's ban on non-essential gatherings, announced on March 25, 2020 when there were over 4,000 confirmed new infections per day and almost 100 confirmed deaths per day. Defendants' attempt to compare Mayor Warren's Curfew to NYC's ban on public gatherings, and to compare this case to *Geller*, is completely disingenuous.").

DISCUSSION

Plaintiffs have requested a temporary restraining order and a preliminary injunction.  "[A] temporary restraining order [("TRO")] serves a purpose different from that of a preliminary injunction," in that "[t]he purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009).  Here, since the Court is making a determination on the merits following oral argument, the Court deems the TRO application to be moot.   In any event, the standard for granting either type of relief is the same:

> "In the Second Circuit, the standard for issuance of a temporary restraining order ("TRO") is the same as the standard for a preliminary injunction." *Fairfield Cty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom. Fairfield Cty. Med. Ass'n v. United Healthcare of New England, Inc.*, 557 F. App'x 53 (2d Cir. 2014). The standard the Plaintiffs must satisfy here requires them to show that they have suffered irreparable harm, that they have a . . .  likelihood of success on the merits,[45] that the balance of equities tips in their favor, and that an injunction is in the public interest. Plaintiffs must show a likelihood of success on the merits—as opposed to the lesser showing of "sufficiently serious questions going to the merits to make them fair ground for litigation"—because they are challenging governmental action taken in the public interest under a statute. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (explaining that "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly").
>
> ***
>
> The final two factors—the balance of the equities and the public interest— merge when, as in this case, the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

---

[45] Defendants do not maintain that Plaintiffs are required to make the higher showing of a clear or substantial likelihood of success that is applicable to applications for "mandatory injunctions." *See*, ECF No. 7-8 at  pp. 13–14.

*Amato v. Elicker*, No. 3:20-CV-464 (MPS), 2020 WL 2542788, at *3 (D. Conn. May 19, 2020).

The movant can establish the "irreparable harm" requirement by alleging the violation of a federal constitutional right. *See, Johnson v. Connolly*, 378 F. App'x 107, 108 (2d Cir. 2010) ("[T]his alleged violation of a constitutional right satisfies Johnson's burden to demonstrate irreparable harm[.]"); *see also, Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996) ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction."). Here, Defendants concede that Plaintiffs have met the "irreparable harm" requirement, insofar as they have alleged the violation of the rights under the First and Fourteenth Amendments.

Turning to the likelihood-of-success-on-the-merits requirement, Plaintiffs contend that they are likely to succeed on their First Amendment claim. To demonstrate a likelihood of success in the context of seeking preliminary injunctive relief, a movant "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (citation omitted).

With regard to the merits of Plaintiffs' First Amendment claim, the parties agree[46] that to survive Plaintiffs' First Amendment challenge, the Emergency Order must satisfy the *Ward* requirements for "time, place and manner" restrictions set forth earlier. The Government has the ultimate burden to prove that the regulation is constitutional. *See, Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012) ("Defendants bear the burden of demonstrating that the regulation was constitutional."). Therefore, to prove that

---

[46] *See*, Pls.' Mem. of Law, ECF No. 3-10 at p. 19 and Defs.' Mem. of Law, ECF No.7-8 at p. 18.

they are likely to succeed on the merits of their claim at the preliminary injunction stage, Plaintiffs must show that Defendants will be unable to meet that burden.[47]

Plaintiffs here concede that the Emergency Order is "content neutral" and therefore satisfies the first of the *Ward* requirements, but they contend that it fails to satisfy the second and third requirements.[48]   In particular, Plaintiffs contend that the Emergency Order is not "narrowly tailored" since it was issued for improper purposes; is not reasonably related to the problems which it is purportedly intended to address; and does not provide any exceptions for First Amendment activities.   Further, Plaintiffs contend that the Emergency Order does not "leave open ample alternative channels for communication of the information" since certain types of protected First Amendment activities, such as outdoor protests, religious services and political gatherings, need to occur specifically at night.   Alternatively, Plaintiffs contend that the Emergency Order is unconstitutionally vague, since it does not explain what is meant by the term "group."[49]

<u>Plaintiffs Have Not Shown a Likelihood of Success on the Merits</u>
<u>Under the *Ward* Test</u>

As discussed earlier, Plaintiffs contend that the reasons Defendants have offered to justify the Emergency Order are pretextual.   That is, Plaintiffs flatly deny that the Emergency Order was issued to address the spread of Covid-19 or to address the

---

[47] *See*, ECF No. 3-10 at p. 20 ("Here, Defendants cannot show that the regulation of nonspeech—the proscription of five or more people gathering in public places between 11:00 p.m. and 5:00 a.m.—is "no more restrictive than necessary".).

[48] Plaintiffs purport to assert both "facial" and "as applied" challenges to the Emergency Order, but maintain that the "substantive legal issues" involved are "essentially the same" with regard to both types of claim. ECF No. 3-10 at p. 26.

[49] *See*, ECF No. 3-10 at p. 25 ("Here, the Curfew is unconstitutionally vague because it provides no guidance on what constitutes "a group[] of five or more" people in a public place, or a "group[] of ten or more unrelated individuals … inside of any location or premises.").

increased number of gunshot injuries.[50]  Defendants assert, rather, that the Emergency Order is somehow related to alleged high-profile incidents of police misconduct, or to a desire to discriminate against "Black and brown neighborhoods."[51]  As proof of pretext, Plaintiffs argue that the Emergency Order could not have been intended to stop the spread of Covid-19, since it imposes tighter restrictions on groups gathered outdoors, where Covid-19 is less likely to be transmitted, than on groups gathered indoors, and imposes no restrictions on taverns, where the likelihood of contracting Covid-19 is high. Further, Plaintiffs argue that if the Mayor's true intent was to prevent the spread of Covid-19, she would not have limited the "curfew" provisions to the overnight hours.  Additionally, Plaintiffs argue that the Mayor could not have been concerned with preventing the spread of Covid-19, since the RPD officers who arrested protesters on July 16th did not observe the proper protocols to prevent the spread of the disease.

Plaintiffs similarly assert that the Emergency Order has "no rational relationship"[52] to the goal of reducing  the number of gunshot injuries, since Defendants have not shown that more shootings occur during the overnight hours than at other times, and since the Emergency Order has not actually resulted in fewer shootings.  On this point, Plaintiffs admit that the total number of shooting victims declined following the issuance of the Emergency Order, but contend that had nothing to do with the order; rather, they posit that the number of shooting victims prior to the order was so abnormally high that it was inevitable that the number would eventually drop.[53]  Plaintiffs argue that to the extent the

---

[50] See, e.g., Reply at p. 5 ("The Mayor obviously did not implement the Curfew2 to stop the spread of COVID-19.").
[51] Compl., ECF No. 1  at ¶ 27 ("Mayor Warren's public statements indicate that the principal objective of her Emergency Order is to suppress First Amendment activities in Black and brown neighborhoods.").
[52] ECF No. 8 at p. 9.
[53] ECF No. 8 at p. 9.

Mayor may have actually intended the order to reduce crime, her issuance of the order was based on  an "inaccurate assumption" that "curfews" reduce crime, rather than on "reasoned analysis."[54]

Defendants have responded with various evidence detailing the so-called "twin evils" that led to the issuance of the Emergency Order.  With regard to the problem of the spread of Covid-19 at late-night gatherings, Defendants have shown that Covid-19 is a serious problem in the State of New York, to put it mildly; that Rochester's "own infection and fatality rates parallel those of the state as a whole";[55] that "[h]ealth professionals attribute [a] rise of cases in other states to a general failure to engage in social distancing and mask-wearing, particularly among younger people";[56] that on March 16, 2020, the Mayor declared a state of emergency in Rochester; that "in mid-May, the State of New York and the Rochester region began to reopen [from the Covid-19 "lockdown"], and that the "reopening came with cautions from local governmental leaders and public health officials that failure to continue to abide by social distancing and mask-wearing requirements could result in increased transmission of the virus;"[57] that "[t]hose warnings were not heeded—particularly among younger people," and that when "the weather started to warm—people were reported gathering in public without engaging in proper social distancing and face covering";[58] that it became increasingly difficult for RPD patrols to observe whether persons at these gatherings were wearing masks and practicing social distancing, particularly at night due to the lack of lighting;[59] and that the Emergency

---

[54] ECF No. 8 at p. 9.
[55] ECF No. 7 at ¶ 11.
[56] ECF No. 7 at ¶ 13.
[57] ECF No. 7 at ¶ ¶ 28–29.
[58] ECF No. 7 at ¶ ¶ 30–31.
[59] ECF No. 7-5 at p. 3.

Order itself recites the history of the Covid-19 pandemic leading up to its issuance, and specifically notes that "throughout the summer months of 2020, and increasingly during the month of July, groups of individuals in the City of Rochester are gathering both indoors and outdoors in public places, without face masks and without social distancing as required by the Governor's Executive Orders, *in particular during the late-night and early morning hours*, increasing the risk of transmission and community spread of the virus."[60]

With regard to the problem of mass shootings at late night gatherings, Defendants have shown that there has recently been an increased number of shooting incidents in Rochester; that "[o]ver the period of June 1 through July 15, the number of shooting incidents is up 49% this year, from 37 shootings in 2019 to 55 this year";[61] that in addition to an increased number of shootings, there has been an increased number of victims; that "[t]he 37 shootings that took place in the City in 2019 resulted in 40 gunshot victims," while "[t]his year's 55 shootings in June and early July have resulted in 70 victims—an increase of 75% over the same period in 2019";[62] that "[t]he disproportionate increase in the number of victims is attributable, at least in part, to the large late-night gatherings taking place in public places in the City and at house parties, resulting in additional individuals being exposed to gun fire";[63] that at large late-night gatherings on both July 5, 2020 and July 11, 2020, there were shooting incidents resulting in multiple gunshot victims; that the shootings at both of these gatherings occurred even though RPD officers were already at the scenes, attempting to disperse the crowds;[64] that a majority of the

---

[60] ECF No. 7-2 at p. 2 (emphasis added).
[61] ECF No. 7 at ¶ 38.
[62] ECF No. 7 at ¶ 30.
[63] ECF No. 7 at ¶ 41.
[64] ECF No. 7-5 at pp. 4–5.

shootings in the month of July occurred between the hours of 11 p.m. and 5 a.m.;[65] and

that according to the RPD, since the Emergency Order went into effect officers have been

able to disperse gatherings during the overnight hours before they become too large.[66]

The record also shows that while the Emergency Order itself does not refer to the

problem of violent crime or mass shootings, on July 15, 2020, contemporaneously with

the issuance of the order,  the Mayor issued a statement indicating that the order was

intended to curb the increased violence that had been occurring in Rochester.  In pertinent

part, the statement indicates:

> (Wednesday, July 15, 2020) – Mayor Lovely Warren and Police Chief
> LaRon Singletary today announced new efforts to curb recent violence in
> Rochester.
>
> "My first duty is ensuring the safety of our community," said Mayor Warren.
> "We must protect the lives of every citizen in Rochester, particularly our
> children. I will not tolerate the lawlessness we have seen on our streets and
> I will do all I can to prevent tragedy from destroying the lives of our families.
> We have been fortunate that we have not seen the loss of life that has
> occurred in other cities."
>
> Mayor Warren referenced the recent shootings of children in other cities
> including a 9-year-old boy in Atlanta, the seven children shot in Chicago in
> the past month and the 1-year-old shot and killed in Brooklyn this past
> weekend.
>
> "The Rochester Police Department will fulfill its duty to protect our
> residents," said Chief Singletary. "While violence has been increasing
> during the pandemic in cities across America, we are responsible for
> protecting our community and bringing violence here to an end. My
> message is that illegal parties and other gatherings will be stopped. If you
> are holding one of these parties, we will shut you down, take your equipment
> and hold you accountable. We will stand up for our families and
> neighborhoods."

---

[65] ECF No. 7-5 at p. 5.
[66] ECF No. 7-5 at p. 6.

Mayor Warren and Chief Singletary requested that the New York State Police provide troopers to assist Rochester Police in enforcing the Emergency Order. Based on that request, dozens of additional troopers will be patrolling City streets this weekend. Also, the Rochester Police Department's Pathways-to-Peace team will respond to gatherings and work with the public to educate and disperse any crowds.

"We are going to bring all of our resources to bear to protect our neighborhoods and our families," said Mayor Warren. "We will insist that everyone act responsibly and with dignity. We won't tolerate those who act selfishly and without regard for their neighbors. We must all protect our city."

*Over 20 people have been shot or stabbed over the last two weeks. Much of this violence has been preceded by house parties or large gatherings on city streets and public parks.* Therefore, the Mayor and Chief announced that laws and regulations regarding public gatherings will be strictly enforced and that New York State Police will assign troopers to assist Rochester Police Department (RPD) in these efforts. *In addition, the Mayor issued a new Emergency Order that no public gatherings of five or more people will be allowed from 11 p.m. until 5 a.m. in a public place. Also, no indoor gatherings of 10 or more unrelated individuals will be allowed from 11 p.m. until 5 a.m. unless the location is licensed under Alcohol Beverage Control Law.*

Mayor Warren and Chief Singletary were joined by City Council Vice President and Chair of Council's Public Safety, Youth and Recreation Committee Willie Lightfoot in making today's announcement.

"We must do everything we can to protect our young people, families and seniors," said Vice President Lightfoot. "I have seen firsthand the impact of violence and commend Mayor Warren and Chief Singletary for taking action. And, I call upon everyone to step and do their part to keep our community safe."

ECF No. 7 at ¶ 45 (emphasis added).

Based upon all of the foregoing, the Court finds that Defendants have adequately shown that the Emergency Order is justified by significant governmental interests, and that the reasons offered by Defendants are not pretextual.  At the outset, the Court notes that government clearly has a significant interest in stopping the spread of Covid-19 and reducing the number of gunshot victims.  Furthermore, Plaintiffs' contentions that the Mayor was motivated by acts of police misconduct or by a desire to discriminate against "Black and brown neighborhoods" are completely speculative.  Similarly, the Court does not believe that the alleged failure by RPD officers to observe Covid-19 protocols while making arrests at the protest on July 16th demonstrates that the reasons for the Emergency Order are pretextual.  Nor does the Emergency Order's failure to regulate the number of persons who gather in bars and taverns suggest pretext, where the City's ability to regulate such activities is preempted by New York's ABC Law.

Plaintiffs' remaining arguments for pretext are similarly unpersuasive.  For example, contrary to what Plaintiffs suggest, Defendants do not maintain that the decision to limit groups to four persons outdoors and to nine persons indoors reflects the scientific likelihood of contracting Covid-19 in those situations in general; that is, Defendants do not contend that it is easier to catch Covid-19 outdoors than indoors.  Rather, Defendants contend that the order imposes a tighter limitation on outdoor gatherings since it is more difficult for police officers to see outdoors at night and to determine whether persons in larger groups are wearing face masks and observing social distancing.  Additionally, the fact that the Emergency Order only applies at night does not suggest pretext, since, while it is true that persons can catch Covid-19 at any time of the day, the specific problem that the Mayor was attempting to solve – large gatherings at which people were not observing

safety protocols—was occurring primarily if not exclusively at night. *See, McCullen v. Coakley*, 573 U.S. 464, 481–82 ("States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist. . . .  In light of the limited nature of the problem, it was reasonable for the Massachusetts Legislature to enact a limited solution. When selecting among various options for combating a particular problem, legislatures should be encouraged to choose the one that restricts less speech, not more.").  Plaintiffs have not shown that similar gatherings were a problem in the City of Rochester during the daytime hours.

Similarly, contrary to Plaintiffs' argument that the order has no rational relationship to the governmental interest in reducing the number of shooting victims, Defendants have shown that the Emergency Order was issued partly in response to, and immediately following, an increase in violence that included two incidents in which high numbers of persons were shot while gathered at large late-night parties.  Once again, contrary to what Plaintiffs suggest, Defendants do not maintain that shootings are more likely to occur at night than during the daytime in general; rather, they contend that *in fact* most of the recent shootings in Rochester had been occurring at night, and that the particular circumstance that was resulting in high numbers of casualties per shooting—large scale street parties—was occurring primarily at night.  Plaintiffs have not shown that similar incidents were occurring during the daytime.  Defendants have further shown that following the issuance of the Emergency Order the number of shooting victims dropped by a third,[67] even if the total number of shooting incidents did not.

---

[67] *See*, ECF No. 7-8 at p. 13 ("[T]he number of shooting incidents increased slightly in the latter half of the month, the number of gunshot victims fell by over a third.").

Plaintiffs have not shown that they are likely to succeed on their argument that the proffered reasons for the Emergency Order are either pretextual or unrelated to significant governmental interests. *See, Lederman v. New York City Dep't of Parks & Recreation*, No. 10 CIV. 4800 (RJS), 2010 WL 2813789, at *9 (S.D.N.Y. July 16, 2010) ("[Defendants] have posited several perfectly legitimate significant interests, and Plaintiffs' attempts to undercut them through assertions of pretext have not established a likelihood of success on the merits.").

Plaintiffs also contend that the Emergency Order is not narrowly tailored to the Mayor's interests, but rather, that it is more restrictive than necessary and regulates expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.  In particular, Plaintiffs argue that the order disproportionately impacts First Amendment rights and fails to include any exception for First Amendment activities.  Plaintiffs also maintain that the City of Rochester has less intrusive means available to prevent large groups from gathering at night, such as N.Y. Penal Law § 240.2(6), which, Plaintiffs argue, "already forbids, "congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse" when such congregation and refusal to disperse is done 'with the intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof.'"

As mentioned earlier, "[a] regulation is narrowly tailored so long as it promotes a substantial government interest that would be achieved less effectively absent the regulation, and is not substantially broader than necessary to achieve the government's interest." *Marcavage v. City of New York*, 689 F.3d at 106 (citations and internal quotation marks omitted).  Importantly, though, "'narrowly tailored' does not mean the 'least

restrictive or least intrusive means.'  Restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Marcavage v. City of New York*, 689 F.3d at 106. That is, "[a]lthough a restriction that is content-neutral must be 'narrowly tailored' to serve the governmental interest, 'it need not be the least restrictive or least intrusive means of doing so.'" *Hobbs v. Cty. of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005) (quoting *Ward v. Rock Against Racism*, 491 U.S. at 798).  At the same time, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. at 495.

Defendants dispute Plaintiffs' contention that the Emergency Order is too restrictive, stating that under the order, "people are free to come and go, to do and say what they wish, at all hours, so long as they do so in groups of less than five when out in a public place, and less than ten when indoors," and, therefore, the order "easily meet[s] *Ward*'s narrow tailoring requirement and are not a substantial burden on speech."[68] Defendants further note that in the face of the novel Covid-19 pandemic, other courts in this Circuit have recently upheld regulations that are even more restrictive than the Emergency Order.  In particular, Defendants cite *Geller v de Blasio*, — F.Supp.3d —, 2020 WL 2520711 (S.D.N.Y. May 18, 2020) ("*Geller*"), and *Amato v Elicker* (May 19, 2020) ("*Amato*").

---

[68] ECF No. 7-8 at p. 20.

34

*Geller* involved a challenge to an executive order by the Mayor of New York City that prohibited all public gatherings of any size.  In its entirety, the challenged executive order stated: "In order to avoid the mass congregation of people in public places and to reduce the opportunity for the spread of COVID-19 any non-essential gathering of individuals of any size for any reason shall be cancelled or postponed." *Geller*, 2020 WL 2520711, at *1.  The plaintiff in *Geller* sought a TRO, alleging that the executive order violated the First Amendment "by preventing her from leading a gathering of individuals on City streets to protest the executive orders issued by Mayor de Blasio." *Geller*, 2020 WL 2520711, at *3.  In denying the request for a TRO, the district court began by indicating that because the executive order was issued to address the serious threat posed by Covid-19, the court  would view the constitutionality of the executive order through the "lens" of the Supreme Court's ruling in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27, 25 S.Ct. 358, 49 L.Ed. 643 (1905) ("*Jacobson*"), which held that "a community has the right to protect itself against an epidemic of disease which threatens its members." *Geller*, 2020 WL 2520711, at *3 (S.D.N.Y. May 18, 2020) (quoting *Jacobson*).  The *Geller* court further observed that pursuant to *Jacobson*, "in the face of such an epidemic, judicial scrutiny should be reserved for a regulation that 'has no real or substantial relation to' the object of protecting 'the public health, the public morals, or the public safety,' or is 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law,'" and that "a 'court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case.'" *Geller*, 2020 WL 2520711, at *3 (quoting *Jacobson*).  Applying the same

test used in *Ward*, discussed earlier, the *Geller* court then found that the executive order

was narrowly tailored, stating:

> Given the severity of the public health crisis, the City has taken measures
> that are reasonable and narrowly tailored in temporarily prohibiting public
> gatherings. While a measure restricting all public group activity may not
> likely be found narrowly tailored in ordinary times, these times are
> extraordinary. The City has demonstrated that the scientific and medical
> communities believe that preventing in-person gatherings is crucial to any
> strategy of containment. As the City has argued, the declining rates of
> infection and death among New Yorkers is evidence not that the gatherings
> ban is overly broad, but rather that it is effective. As there is no evidence to
> suggest that the City has misunderstood the dangers of person-to-person
> spread of COVID-19, the Court declines to second guess the City's
> measure that clearly seeks to mitigate this risk.

*Geller*, 2020 WL 2520711, at *4.  The *Geller* court further found that the executive order

left open ample alternative channels for communication of the information, since the

executive order's ban on gatherings did "not prohibit an individual from protesting on City

streets alone," stating in that regard:

> Of course, it is true, as the plaintiff argues, that a single person protesting
> in public is not a perfect substitute for public group protests. Alternative
> channels for communication and political protest, however, remain open.
> The plaintiff is free to express her discontent online, through media, and by
> protesting in public on her own. For now, these are acceptable alternatives
> to public group protests.

*Geller*, 2020 WL 2520711, at *4.

Similarly, *Amato* involved a challenge to orders issued by the governor of

Connecticut and the mayor of New Haven, related to the Covid-19 pandemic, limiting the

number of persons who could gather for social or recreational purposes. *Amato*, 2020 WL

2542788, at *2–3.  The court's decision particularly focused on an order by the governor

prohibiting social or recreational gatherings of more than five persons, which, the plaintiff

36

alleged, violated his First Amendment "rights of assembly and association." *Id.* at *8. The defendants argued that the plaintiff could not establish irreparable harm based on a violation of freedom of assembly, since the challenged order did "not "prohibit Plaintiffs from assembling" with anyone—"[i]t merely limit[ed] the number of people that Plaintiffs [might] gather and associate with at any one time"; however, the court rejected that argument, observing that "freedom of assembly includes the right to gather in a crowd." *Amato*, 2020 WL 2542788, at *8. However, the court found that the plaintiff was not likely to succeed on the merits of his First Amendment claims, since "*Jacobson* establishes that states may institute extraordinary measures to protect public health." *Id.* at *9; *see also, id.* at *10 ("Even constitutional rights, including First Amendment rights, are subject to 'reasonable conditions' to preserve public health."). Alternatively, the court indicated that "even if *Jacobson* did not apply," *id.* at *9, the challenged order was narrowly tailored and left open ample alternative channels for communication. *Id.* at *11. More specifically, the court found that the challenged order's "restriction on the size of social and recreational gatherings specifically exempt[ed] religious services, private workplaces, and retail establishments—which present[ed] less obvious risks of physically close, sustained interaction than face-to-face social gatherings," and left open alternative channels of communication since "Connecticut residents [were] free to communicate and express themselves in any means other than a large, in-person gathering[s]." *Amato*, 2020 WL 2542788, at *11.

Defendants contend that cases like *Geller* and *Amato* establish that the subject Emergency Order "easily" passes the *Ward* test, while Plaintiffs maintain that the Court should disregard those decisions since the conditions in Rochester now are unlike the

conditions that existed in New York City and Connecticut at the time *Geller* and *Amato* were decided.  However, while the Court does not necessarily agree with Defendants' suggestion that the Emergency Order "easily" survives Plaintiffs' challenge, it agrees with Defendants that the order is narrowly tailored and leaves open ample alternative channels of communication.  In this regard, the Court agrees with the approach taken in *Geller*, in which the court viewed the *Ward* test through the "lens" of *Jacobson*.  That is, regardless of whether the Emergency Order would pass muster under the *Ward* test in more normal times, it passes muster under the unique circumstances presented at the current time by the Covid-19 pandemic.  In this regard, while the circumstances in Rochester may perhaps not be as dire as those that existed in New York City at the exact moment *Geller* was decided, they are still sufficiently serious to warrant the invocation of *Jacobson*.

Consequently, when considering the narrow tailoring requirement the Court declines to second-guess the Mayor's decision to limit gatherings in the manner contained in the Emergency Order, since Plaintiffs have not come near to showing that the order "has no real or substantial relation to the object of protecting the public health, the public morals, or the public safety," or that it is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."[69]  Nor under these circumstances does the Court find that the lack of any exception in the Emergency Order for First Amendment activities renders the order unconstitutional, since  Covid-19 can be spread just as easily at a peaceful protest as it can be at other types of gatherings.

---

[69] The Court notes that Defendants' papers do not appear to directly respond to Plaintiffs' contention that the Emergency Order was unnecessary since N.Y. Penal Law § 240.2(6) already forbids, "congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse" when such congregation and refusal to disperse is done "with the intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." The Court nevertheless understands Defendants to be maintaining that existing statutes did not adequately provide police with authority to disperse the crowds before they became too large or too unruly.

Additionally, the Emergency Order does not violate the "narrowly tailored" requirement merely because it fails to include an exemption or exception for the types of protests that Plaintiffs want to conduct.  On this point, Plaintiffs contend that the Mayor's purported interest in reducing the number of late-night gunshot casualties is not served by restricting peaceful demonstrations by large groups of people:

> The government has no interest in preventing protesters from engaging in protected First Amendment activities, or in preventing legal observers from observing and documenting the interaction between police officers and protesters. While the government has an interest in reducing violent crime, that interest is not served by arresting peaceful protesters, legal observers or journalists who present no threat of harm to the police or the public.

ECF No. 3-10 at p. 32.  However, it is well settled that

> [t]he First Amendment does not bar application of a neutral regulation that incidentally burdens speech *merely because a party contends that allowing an exception in the particular case will not threaten important government interests. Regulations that burden speech incidentally or control the time, place, and manner of expression must be evaluated in terms of their general effect.* Nor are such regulations invalid simply because there is some imaginable alternative that might be less burdensome on speech.  Instead, an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.

*United States v. Albertini*, 472 U.S. 675, 688–89, 105 S. Ct. 2897, 2906–07, 86 L. Ed. 2d 536 (1985) (emphasis added, citations omitted).

Moreover, Plaintiffs have not shown that the Emergency Order fails to leave open alternative channels of communication.  On this point,

>[a]lthough an alternative channel for communication must be available, it is clear that the First Amendment does not guarantee protesters access to every or even the best channels or locations for their expression.  The requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed 'ample.' All that is required is that an alternative channel be ample—i.e., an "adequate" channel for communication.

*Marcavage v. City of New York*, 689 F.3d at 107 (citations and internal quotation marks omitted).

Here, Plaintiffs' assertion that the Emergency Order "proscribes almost every form of public expression during the late-night hours" is plainly an exaggeration, since the order only applies to groups of more than four persons outdoors and groups of more than nine persons indoors.  The Emergency Order is neither a categorical ban nor a curfew, since it leaves Individuals and smaller groups of persons free to engage in First Amendment activities during the overnight hours.  During those hours, the Emergency Order does not restrict any individual's freedom of expression or freedom of movement *per se*; it only temporarily restricts individual's ability to engage in activities with groups larger than four persons outdoors or with groups larger than nine persons indoors.  To the extent that Plaintiffs wish to conduct protests larger than those permitted by the Emergency Order, they have eighteen hours per day in which they may do so.  The Emergency Order is therefore less restrictive than the order at issue in *Geller*.

For all of the foregoing reasons the Court finds that Plaintiffs have not demonstrated that they are likely to succeed on the merits of their First Amendment claim under the *Ward* test.

<u>Plaintiffs Have Not Shown That They Are Likely to Succeed</u>
<u>on their Vagueness Claim</u>

Plaintiffs alternatively contend that the Emergency Order is unconstitutional

because its use of the term "group" is impermissibly vague.

> Basic principles of due process assure that punishment should be imposed
> only if the defendant could reasonably be expected to have known that his
> conduct was proscribed. As the Supreme Court has held, a statute or policy
> is unconstitutionally vague if people of common intelligence must guess at
> its meaning and may differ as to its application. *See Grayned v. Rockford*,
> 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Additionally,
> in order to prevent arbitrary and discriminatory enforcement, a law must
> provide sufficient standards to guide its application. *See id.* And, "[w]here a
> statute's literal scope . . . is capable of reaching expression sheltered by the
> First Amendment, the doctrine demands a greater degree of specificity than
> in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 39
> L.Ed.2d 605 (1974).

*Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 480 (2d Cir. 1999).[70]

In support of their vagueness argument, Plaintiffs attempt to show that one of the

protesters on July 16, 2020 was confused about the meaning of the word "group" in the

Emergency Order.  In particular, Plaintiffs state:

> The statute does not state how closely together the five or more individuals
> must be standing in order to be considered a "group[] of five or more" people
> in a public place. Six feet? Ten feet? Twenty feet? This vagueness problem
> is highlighted by the video of protester Tarik Grandoit captured by Darien
> Lamen in the early morning hours of July 16, 2020 inside of Martin Luther
> King Jr. Memorial Park. Lamen Decl. ¶ 15, and video available at:
> https://www.dropbox.com/s/27h181odf34nbwj/GROUP_OF_ONE.mp4?dl=

---

[70] *See also, Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) ("The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A component of the Due Process Clause, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.  In any vagueness case, then, the challenger can prevail by showing that the statute either fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or authorizes or even encourages arbitrary and discriminatory enforcement.") (citations and internal quotation marks omitted), *cert. denied*, 139 S. Ct. 2714, 204 L. Ed. 2d 1123 (2019).

0. As the video shows, when Mr. Grandoit repeatedly asked the officers how closely he needed to stand to other individuals to be considered part of a "group", they could not answer him. *Id.*

ECF No. 3-10 at p. 25.

The Court does not agree that the order is impermissibly vague. In that regard, the Court notes, preliminarily, that it has watched the above cited "video of protester Tarik Gandoit" and disagrees with Plaintiffs' characterization of what it depicts. The video shows an individual protester, identified by Plaintiffs as Grandoit, his mouth covered with a bandana, yelling into a megaphone at a line of police officers who are standing twenty to thirty feet away. Notably, Grandoit began shouting his questions at the same time that an officer was already loudly reading a message to disperse over a loudspeaker, and while other persons were yelling obscenities, thus the Court doubts whether the officers could understand what Grandoit was saying. Even assuming that the officers could understand Grandoit, his demeanor did not suggest that he was actually confused as to the meaning of the Emergency Order or that he was sincerely seeking guidance from the officers; rather, his tone was combative and rhetorical. Indeed, the Court has little doubt that any purported confusion on Grandoit's part was feigned. Consequently, it is hardly surprising that the officers did not respond to Grandoit. Therefore, Plaintiffs' contention that the officers "could not answer him,"[71] implying that they were unable to explain the meaning of the word "group" to him, is disingenuous.

Moreover, Plaintiffs' submissions indicate that plaintiff Stanley Martin, who also attended the protest on July 16th, had no difficulty determining whether she was part of a group during the protest on July 16th. *See,* Martin Aff., ECF No. 3-5 at ¶ ¶ 20–22, 24 ("I

---

[71] ECF No. 3-10 at p. 25.

42

then positioned myself approximately 10 to 20 feet away from the group so I could observe the police and the protesters. . . .  At approximately 2:17 a.m. the RPD officers suddenly ordered the group to "step back" . . . Because I was standing approximately 20 feet from the group, the police did not kettle me in with the others who were encircled .  .  . After the group was encircled, I remained present in the vicinity . . . [A police officer chased me, but] I ran because I was doing nothing wrong and I was not congregated with a "group" of five or more people.").

In any event, the Court finds that, as used in the Emergency Order, the term "group" is clear and unambiguous, and that the order provides people of common intelligence with clear notice of what is prohibited.  Plaintiffs are therefore not likely to succeed on the merits of their vagueness challenge.

Because Plaintiffs have not shown that they are likely to succeed on the merits of their First Amendment claims, the Court declines to consider the other factors that a plaintiff must meet in seeking a temporary restraining order.

CONCLUSION

For the foregoing reasons, Plaintiffs' application for preliminary injunctive (ECF No. 3) relief is denied.

IT IS SO ORDERED.

DATED:       August 26, 2020
             Rochester, New York


                                          CHARLES J. SIRAGUSA
                                          United States District Judge

43